**STATE of Missouri, Respondent,**

v.

**Jerel T. JACKSON, Appellant.**

**No. WD 73323.**

Missouri Court of Appeals,
Western District.

June 5, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 31, 2012.

Rosemary Percival, Kansas City, MO, for Appellant.

Richard Starnes, Jefferson City, MO, for Respondent.

Before JOSEPH M. ELLIS, P.J., JAMES EDWARD WELSH, and ALOK AHUJA, JJ.

**JAMES EDWARD WELSH, Judge.**

Jerel T. Jackson appeals the circuit court's judgment convicting him of two counts of murder in the second degree, three counts of armed criminal action, and one count of first-degree assault after a trial by jury. At the commencement of Jackson's trial, the circuit court found Jackson to be a prior and persistent offender pursuant to section 558.016.[1] After the jury's guilty verdict, the court sentenced Jackson to twenty-two years for each murder count, twenty-two years for the first-degree assault count, and three years for each count of armed criminal action, all to run concurrently. Jackson asserts four points on appeal. First, he contends that the circuit court erred in overruling his *Batson*[2] challenge to the State's peremptory strike of Venireperson Takeshia Ford from the pool of alternate jurors, asserting that the State's explanation for the strike was pretextual. Second, Jackson maintains that the court erred in overruling his motion for acquittal, contending that the evidence was insufficient to prove Jackson's guilt as to first degree assault and armed criminal action against nine-year-old victim Myron Ford. Third, Jackson contends that the court erred in overruling his motion for mistrial after the State made improper and prejudicial closing arguments. Finally, Jackson contends that the court erred in refusing his right to jury sentencing because the State's amended information failed to include Jackson's prior offender status. We affirm in part and reverse and remand in part.

Viewed in the light most favorable to the verdict, the evidence established that Jackson first met Wardell Williams in December of 2005. Jackson admitted having

---

1. All statutory references are to RSMo 2000, as updated by the 2011 cumulative supplement, unless otherwise noted.

2. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

knowledge of a violent side to Williams, as Jackson testified that he had observed Williams attack and beat Williams's girlfriend, Erica Bennett. On November 26, 2006, Jackson and Williams discussed robbing Kimberly Ford and Ricky Gardner. At approximately 6:00 pm that evening, Jackson accompanied Williams, Shannon Aufai, and Erica Bennett to the home of Ford and Gardner. Jackson and Aufai were dating at the time, as were Williams and Bennett. Aufai drove her vehicle. Bennett was in the passenger seat while Williams and Jackson rode in the back. Williams carried a black 12–gauge sawed-off pump-action shotgun. When the four arrived at Ford and Gardner's apartment, Ford's nine-year-old son, Myron, opened the door to Bennett. Myron was familiar with Bennett, as Bennett had previously spent the night at Myron's home. Bennett and Aufai went to a back bedroom where Ford and Gardner were lying on a bed watching television. Shortly thereafter Williams and Jackson entered the room. Jackson had the drawstring pulled on his hooded jacket, obscuring his face, and Williams's face was covered with a bandanna. Williams ordered Myron, who was sitting on a computer chair, to go to the bed with Ford and Gardner. Williams pointed his gun at Gardner and demanded money. Gardner held his hands up while Jackson dug through Gardner's pockets. Jackson collected Gardner's jewelry and other items located on a dresser. Williams then questioned Gardner twice with, "I thought you didn't have no money?" and then shot Gardner in the face. Williams then turned the gun on Ford and shot her in the forehead, left elbow and the back of her left thigh. Ford and Gardner were dead when police arrived on the scene. Williams also shot Myron; his left arm was nearly severed and held on by only tissue and tendons, and his right arm and face sustained injury as well.

After the shooting began, Jackson, Aufai, and Bennett retreated to their vehicle where Jackson instructed Aufai to wait for Williams. Soon thereafter, Williams entered the car, still carrying the gun. Jackson instructed Aufai to drive to the "30's," the neighborhood Jackson was from, and upon arriving at the 3600 block of Wayne Avenue in Kansas City, Bennett observed Jackson take the gun and give it to some "dudes." Jackson purchased "weed" on East 36th Street to "calm his nerves."

Jackson was indicted for and convicted by a jury of two counts of second-degree murder, one count of first-degree assault, and three counts of armed criminal action. Jackson appeals.

■ In his first point on appeal, Jackson contends that the circuit court erred in overruling his *Batson* objection to the State's peremptory strike of venireperson Takeshia Ford from the pool of alternate jurors, asserting that the State's explanation for the strike was pretextual. Jackson contends that he established that the State's given reason for the strike, that Venireperson Ford was working to become a prison chaplain, was pretextual. He contends that Ford's pursuit of prison chaplaincy had no bearing because the jurors would be assessing the credibility of one inmate over another. Further, he contends that Ford's purpose for pursuing her chaplain's license was to assist law enforcement, not prison inmates. Additionally, Jackson maintains that Ford's connection with law enforcement would have made her a stronger juror for the State than white Venireperson Thomas Remley, whom the state chose not to strike.

When reviewing a ruling on a *Batson* challenge, we accord the circuit court "great deference because its findings of fact largely depend on its evaluation of credibility and demeanor." *Kesler–Fergu-*

*son v. Hy–Vee, Inc.*, 271 S.W.3d 556, 558 (Mo. banc 2008). We will reverse the circuit court's decision only if it is clearly erroneous. *Id.* To find the decision is clearly erroneous, we "must have a definite and firm conviction that a mistake was made." *Id.*

Missouri has a three-step procedure for resolving a *Batson* challenge. *Id.* In the first step, the party challenging the strike must object and make a *prima facie* case of racial discrimination by identifying the protected class to which the potential juror belongs. *Id.* at 559; *State v. Bateman,* 318 S.W.3d 681, 689 (Mo. banc 2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 927, 178 L.Ed.2d 772 (2011). In the second step, the proponent of the strike must present a specific and clear race-neutral reason for the strike. *Kesler–Ferguson,* 271 S.W.3d at 559. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The sole issue at this stage is the facial validity of the explanation. *Id.* at 768, 115 S.Ct. 1769. Unless a discriminatory intent is inherent in the reason given, the circuit court should deem the reason to be neutral. *Id.*

If the proponent of the strike articulates an acceptable non-discriminatory reason for the strike, then, at the conclusion of the third step, the circuit court must decide whether the party challenging the strike "has proved purposeful racial discrimination." *Id.* at 767, 115 S.Ct. 1769. To prove purposeful racial discrimination, the party challenging the strike must demonstrate that the proffered reason for the strike was merely pretextual and that the strike was, in fact, motivated by race. *Bateman,* 318 S.W.3d at 689. To meet this standard, the party challenging the strike "must present evidence or specific analysis" showing that the proffered reason was

pretextual. *State v. Johnson,* 930 S.W.2d 456, 460 (Mo.App.1996). The party "cannot simply rely on conclusory allegations that the real motivation for the strike was racial in nature." *Id.* Factors that may be relevant to the determination of pretext include: (1) "the presence of 'similarly situated white jurors who were not struck,' " *State v. Strong,* 142 S.W.3d 702, 712 (Mo. banc 2004) (citation omitted); (2) "the degree of logical relevance between the explanation and the case to be tried in terms of the nature of the case and the types of evidence adduced," *Kesler–Ferguson,* 271 S.W.3d at 559; (3) "the striking attorney's demeanor or statements during *voir dire,*" *id.*; and (4) the circuit court's past experience with the striking attorney. *Id.* Because the circuit court is in a better position to observe trial counsel's sincerity and credibility and to observe the racial makeup of the jury panel, we rely on the circuit court "to consider the plausibility of the striking party's explanations in light of the totality of the facts and circumstances surrounding the case." *Id.*

Here, Jackson met step one of the three-step procedure by asserting a *Batson* challenge on the State's strike of African American Venireperson Ford. The State then met step two of the procedure by offering the race-neutral justification that the strike was due to Venireperson Ford's training toward her stated intent to become a prison chaplain. Jackson challenged this reason as pretextual, indicating that "if you wanted to come up with a way to strike African–Americans you'd ask for people who work in prison ministries . . . . as virtually all of the people [who] do are African–American." The State responded that,

> If someone is wanting to work with prisoners in the jail that they have some compassion and concern for these people, and they have a different view point.

And that's why they're doing I think a unique job. And it's a job that we feel is unfavorable for the State. And that's why we put it on that list.

Step three of the *Batson* process was complete when, based on this explanation, the court deemed the strike race-neutral and Jackson failed to prove pretext. We find nothing clearly erroneous with the court's ruling. The State's justification appears race-neutral and applicable to a case where the defendant may, if convicted, be subject to a lengthy incarceration. *See State v. Edwards*, 116 S.W.3d 511, 527 (Mo. banc 2003). Additionally, the State's explanation appears clear, reasonably specific and legitimate. *Id.* Had Jackson presented evidence or specific analysis to prove his statement that "virtually all of the people" working in prison ministries are African American, Jackson still would not have proven that the State's move to strike Venireperson Ford because she was pursuing work in prison ministry was inherently pretextual. Although we are not inclined to entertain at length Jackson's additional rationale to support his allegations of pretext, raised for the first time on appeal, we deem his additional arguments to be facially unpersuasive after review of the record. Point one is denied.[3]

▮ In his second point on appeal, Jackson contends that the court erred in overruling his motion for acquittal as to first degree assault and armed criminal action against nine-year-old victim Myron Ford, contending that the evidence was insufficient to prove Jackson's guilt. Jackson contends that the State failed to prove that he purposefully promoted or furthered the

first degree assault of Myron or aided or encouraged Williams in committing that assault. Jackson contends that he fled the scene before Myron was shot by Williams and that he never expected, promoted, aided, or encouraged the shooting of any victims.

In reviewing the sufficiency of the evidence, we accept as true all evidence favorable to the State, and "[a]ll evidence and inferences to the contrary are disregarded." *State v. Crawford*, 68 S.W.3d 406, 407–408 (Mo. banc 2002). Our review is "limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* at 408.

▮ In order for the State to prove that Jackson committed armed criminal action and first degree assault against Myron, the State had to prove, pursuant to section 562.041, that before or during Williams's armed criminal action and first degree assault of Myron, Jackson aided, agreed to aid, or attempted to aid Williams in planning, committing, or attempting to commit the offenses. With regard to accomplice liability, our Supreme Court in *State v. Barnum*, 14 S.W.3d 587, 591 (Mo. banc 2000), stated:

> While mere presence at a crime scene, considered alone or in combination with a refusal to interfere, is insufficient to support a conviction, the broad concept of 'aiding and abetting' plainly encompasses acts that could be construed as 'encouragement' or its derivation. Mere encouragement is enough. Encourage-

---

**3.** The State argues, per *State v. Carter*, 889 S.W.2d 106, 109 (Mo.App.1994), that an overruled Batson challenge to an alternate juror on appeal is not challengeable on appeal where no alternate juror serves on the jury, because there is no Constitutional right to be an alternate juror. As in *Goodman v. Holly*

*Angle*, 342 S.W.3d 458, 464 (Mo.App.2011), we need not address the merits of this argument as we find, herein, that the circuit court did not err in overruling the challenge, and reference *Carter v. Kemna*, 255 F.3d 589 (8th Cir.2001) regarding this issue.

ment is the equivalent of conduct that by any means countenances or approves the criminal actions of another. 'Countenances or approves' includes encouraging or exciting [a criminal act] by words, gestures, looks, or signs. In fact, associating with those that committed the crime before, during, or after its occurrence, acting as part of a show of force in the commission of the crime, attempting flight from the crime scene, or failing to assist the victim or seek medical help are all factors which may be considered. (Internal quotations and citations omitted).

Here, the evidence shows that Jackson colluded with Williams to rob Ford and Gardner, accompanied Williams, who was armed, to Ford and Gardner's home, and pilfered Gardner's pockets and belongings while Williams threatened Ford, Gardner, and Myron with the loaded weapon. Jackson, himself, testified that Williams "pointed the gun at the kid and told him to get on the bed." After Jackson looted Gardner's pockets, Williams shot Gardner and then proceeded to shoot Ford and Myron. While Jackson maintains that he should share no accountability for Williams's assault on nine-year-old Myron, Jackson overlooks that there is no distinction between principals and accessories in Missouri and that all persons who act in concert are equally guilty. *Id.* Not only did Jackson collude with Williams prior to and during the robbery, murders, and assault, Jackson fled the scene, made no attempt to prevent the shootings or assist victims, and instructed the getaway driver, Aufai, to wait for Williams. After Williams returned to the vehicle, Jackson instructed Aufai where to drive and disposed of the assault weapon by giving it to some men in his childhood neighborhood. Jackson never sought out law enforcement to report the events.

We conclude that the evidence is sufficient for a reasonable juror to have concluded, beyond a reasonable doubt, that before or during Williams's armed criminal action and first degree assault of Myron, Jackson aided, agreed to aid, or attempted to aid Williams in planning, committing, or attempting to commit those offenses. Point two is denied.

■ In his third point on appeal, Jackson contends that the court erred in overruling his motion for mistrial after the State made improper and prejudicial closing arguments. Jackson contends that the State implied a special knowledge of facts not before the jury and exploited the prosecutor's position of public trust when, in closing arguments, the State argued that, because Aufai was lying and because the State did not want to suborn perjury and guarded their reputations closely, they did not call Aufai to testify.

We review preserved allegations of error in closing argument for abuse of discretion. *In Re Brasch,* 332 S.W.3d 115, 121 (Mo. banc 2011). We must find prejudicial error to reverse a ruling on a claim of improper argument and will not reverse a ruling on a motion for mistrial absent a manifest abuse of discretion. *Id.*

In closing argument, Jackson's counsel accused the State of failing to "tell the jury everything" and "bring in all the evidence." Jackson's counsel accused the State of hiding evidence from the jury, misstating the evidence, and attempting to "convict innocent people." Jackson's counsel stated:

It used to be as a prosecutor what you did is you got all the evidence, you tested everything, you made sure the defense attorney had it, and then you showed it to the jury. You showed it to them for two reasons. One, as a matter of principle and honor. How can any prosecutor expect twelve people to make

a decision of life or death with[out] telling them everything. Pimples and warts, everything. You just let them have the whole thing. And that is what you should expect. And that's what you should demand. And what goes on in this case?

Jackson's counsel additionally insinuated that the State bribed a witness by telling the jury that witness Bennett's testimony was "her bribe for a lid of twenty." With regard to Shannon Aufai's testimony, Jackson's counsel stated:

This is a case of the State not wanting you to see the evidence. And that should offend you. Keep in mind, if their duty, if their oath is to seek justice, think what went on in this case. Shannon was endorsed by them as a witness. Made to sit down here each and every day of trial and because of that, couldn't listen to evidence in her own case, and sat outside waiting. And they didn't call her. They didn't want you to hear— they don't want you to hear this stuff because it doesn't fit with what they are saying.

Additional statements made by Jackson's counsel to the jury include the statement that "[t]here is something going on in this case that the State isn't producing," and "[l]ook at what they have chosen to withhold from you including the testimony of Shannon."

Now, after insinuating bribery by the State, attacking the State's "honor," and accusing the State of purposefully withholding Aufai's testimony for a devious purpose, Jackson contends that the State's response to these allegations warrant a mistrial. In light of Jackson's provocation, we find no error in the State's retaliatory argument in closing. The state responded with the following:

Talk about—we didn't want you to hear Shannon Aufai because we take our re-

sponsibility so—because we guard our reputation so closely, we're not going to put someone on the stand that we think may suborn perjury and that's why we didn't put her on.... That's why we didn't put her on, so don't get caught up with that either.

■ "A prosecutor has considerable leeway to make retaliatory arguments at closing." *State v. Parker*, 886 S.W.2d 908, 922 (Mo. banc 1994). "A defendant may not provoke a reply to his own argument and then assert error." *Id.* Here, Jackson is asserting error on a provoked reply to his own argument. Beyond that, Aufai testified at the trial in Jackson's defense. The jury heard Aufai's testimony and the inconsistencies between her testimony and the State's evidence. A prosecutor may comment on a witness's credibility during closing argument. *State v. Chism*, 252 S.W.3d 178, 188 (Mo.App.2008). Here, the State justifiably commented on Aufai's credibility. The circuit court did not abuse its discretion in overruling Jackson's motion for mistrial due to the State's closing argument. Point three is denied.

■ In his fourth point on appeal, Jackson contends that the court infringed his right to jury sentencing because the State's amended information failed to include Jackson's prior offender status, as required by section 558.021. On December 15, 2006, the State indicted Jackson on two counts of murder in the second degree, one count of assault in the first degree, and three counts of armed criminal action. On July 26, 2010, the day trial commenced, the State filed an information in lieu of indictment with the same counts, but additionally charged Jackson as a prior offender. On that same date, the court found Jackson to be a prior offender based on a May 24, 2004 guilty plea by Jackson to felony unlawful use of a weapon. On

August 2, 2010, before the final instructions were read, the State filed an amended information charging the same offenses but failing to allege Jackson's prior offender status.

To succeed on this point, Jackson must demonstrate that section 558.021, which sets forth prerequisites for determining prior offender status, was violated and that the violation resulted in prejudice. *State v. Teer*, 275 S.W.3d 258, 260–61 (Mo. banc 2009). Matters of statutory application are reviewed *de novo*, without deference to the trial court's judgment. *State ex rel. Missouri Highways and Transp. Com'n v. Greenwood*, 269 S.W.3d 449, 454 (Mo.App. 2008). We agree that the State failed to properly plead and prove Jackson as a prior offender pursuant to section 558.021, and therefore, Jackson was prejudiced by the court's denial of jury sentencing.

Here, while Jackson was initially found to be a prior offender pursuant to the State's July 26, 2010 information, the State's August 2, 2010 amended information superseded the July information pursuant to section 545.110. *State v. Nesbitt*, 299 S.W.3d 26, 31 (Mo.App.2009). Section 545.110 declares a prior information "suspended" and "quashed" by a second information.[4] Therefore, the July 26, 2010 information was quashed by the August 2, 2010 information, and the court's prior offender finding based on the quashed information became a nullity. *Nesbitt*, 299 S.W.3d at 29. The State's attempt to resurrect its prior offender charge by filing a second amended information on August 24, 2010, twenty-two days after the jury returned its verdict, was futile because section 558.021.2 mandates that "prior offender status 'shall' be pleaded and proven prior to the case being submitted to the jury." *State v. Teer*, 275 S.W.3d 258, 261 (Mo. banc 2009). Here, the State did not plead all essential elements of prior offender status in the August 2, 2010 information, and, consequently, prior offender status was never proven. Therefore, sentencing of Jackson as a prior offender was error.

The State contends that per *McGaughy v. State*, 128 S.W.3d 857 (Mo.App.2004), the August information did not supersede the prior offender allegation in the July information. The State maintains that because a subsequent information or indictment only supersedes a previous charge to the extent it alters the same offense, and the prior offender language was not amended, it was not superseded. We disagree. The facts in Jackson's case are distinguishable from *McGaughy* in nearly the same way the facts in *State v. Nesbitt* were distinguishable from *McGaughy*. In *McGaughy*, the State filed amended indictments or informations individually revising the language of specific counts. *Nesbitt*, 299 S.W.3d at 30. Where the amended informations selectively amended specific counts regarding specific offenses, it was deemed to have only superseded the counts selectively amended. *McGaughy*, 128 S.W.3d at 861.[5] Here, as in *Nesbitt*, the August information did not amend a specific count, but was a new information that included all prior charged offenses and superseded the previously filed information in full. *Nesbitt*, 299 S.W.3d at 30. The State's argument suggests that the prior offender count is an "offense" under section 545.110, in that it should survive

---

4. "Although the statute mentions only indictments, it applies to informations as well." *McGaughy v. State*, 128 S.W.3d 857, 860 (Mo.App.2004).

5. The court indicated, however, that "[s]uch piecemeal amendment is not the best practice, and it would have been better if the State had set forth the text of the entire information to avoid any potential confusion." *Id.*

being quashed and superseded by a subsequent information that supersedes all other counts. However, the prior, persistent, and dangerous offender statutes, per sections 558.016 and 557.036 do not define "offenses" that one can be charged for separately, but define prior acts of a defendant that may expose the defendant to enhanced penalties or the deprivation of jury sentencing upon a finding of guilt for new offenses. The prior, persistent, and dangerous offender statutes have no application unless and until the defendant is found guilty of new offenses that warrant a prior, persistent, or dangerous offender classification. Therefore, when the offenses upon which the application of the prior, persistent and dangerous offender statutes depend are quashed, the prior, persistent, and dangerous offender allegations are simultaneously quashed.

We, therefore, conclude that the circuit court did not clearly err in overruling Jackson's *Batson* objection to the State's peremptory strike of venireperson Takeshia Ford from the pool of alternate jurors. The State's justification was race-neutral and applicable to a case where the defendant may, if convicted, be subject to a lengthy incarceration. Further, the court did not err in overruling Jackson's motion for acquittal as to first degree assault and armed criminal action against nine-year-old victim Myron Ford. The evidence was sufficient for a reasonable juror to have concluded, beyond a reasonable doubt, that before or during Williams's armed criminal action and first degree assault of Myron, Jackson aided, agreed to aid, or attempted to aid Williams in planning, committing, or attempting to commit those offenses. In addition, the court did not abuse its discretion in overruling Jackson's motion for mistrial due to the State's closing argument. The State justifiably commented on Jackson's witness's credibility, and, in light of Jackson's allegations against the State,

justifiably addressed those allegations in closing argument. Finally, we hold that the August 2, 2010 amended information superseded the July 26, 2010 information, thereby quashing the July information. Thus, the circuit court's finding of prior and persistent offender status based on the quashed information became a nullity, and Jackson was entitled to jury sentencing. We affirm the circuit court's judgment as to Jackson's convictions, however, the judgment as to Jackson's sentences is vacated and remanded for jury sentencing.

All concur.